[No. 2794.]

THE PEOPLE EX REL. SCHOOL DISTRICT No. 5 IN MIN-
ERAL COUNTY v. VAN HORN, COUNTY SUPERIN-
TENDENT OF PUBLIC SCHOOLS.

1.  School Districts—Organization—Boundaries.

After the county superintendent of public schools has passed upon a petition to organize a new school district out of a portion of one or more old districts and has determined that the school interests of the districts affected will be best promoted by the organization of such new district, the sole power to determine the question as to whether or not the district shall be organized and the boundaries of the district, is in the electors of the proposed district. Neither the board of directors of the school district, the county superintendent of schools nor the state board of education can organize a school district, or change its proposed or established boundaries except where the boundaries are found to be conflicting.

2.  Same—Record—Map—Mandamus—County Superintendent.

· The recording by the county superintendent of schools, in a book kept for that purpose, of the description of the boundaries of a newly-organized school district as defined by the electors, and preparing a map of the same as required by sections 2988 and 2992 Mills' Ann. Stats., is purely a ministerial duty and may be enforced by writ of mandamus upon proper showing.

3.  Public Schools—School Boards and Superintendents—Juris-
    diction—Statutory Construction.

The statutory provisions conferring upon district school boards, county superintendents and the state board of education power to decide questions of law and fact, and making the decision of the county superintendent final unless appealed from, and if an appeal be taken to the state board of education making the action of that board final, should not be construed as making such judgments or decisions final in the sense that they are not reviewable by the courts, and that no judicial inquiry into their correctness can be had.

4.  Mandamus—Jurisdiction—Ruling of State Board of Education.

In a proceeding by mandamus to compel a county superin-

tendent of schools to perform a ministerial duty, where a decision of the state board of education is pleaded in defense, and the jurisdiction and power of the state board to render the decision· and the correctness thereof are raised by, the reply, the court has jurisdiction to determine the question of the validity of such decision.

5. School Districts—Boundaries—Jurisdiction—State Board of
    Education.

The state board of education has no power, upon an appeal from the action of the county superintendent of schools, by its decision to change the boundaries of a school district, as established by the electors at a meeting called for that purpose.

6. School Districts—Boundaries—Limitation.

Where the district school boards of a newly-organized district· and the old district from which it was taken met and· by agreement changed the boundaries of the new district fixed by the electors, and the new district without objection permitted the old district to exercise undisputed the prerogatives and enjoy the privileges of a legally-formed district for the period of a year next succeeding the election of its officers over the territory taken from the new district by the change of boundary, the new district lost its right to the territory taken from it by the change, although the boards had no power or authority to make such change.

*Appeal from the District Court of Mineral County.*

Messrs. JOHN R. SMITH and ALBERT L. MOSES, for appellant.

Messrs. C. H. PIERCE and W. C. BOWEN, for appellee.

MAXWELL, J.

The facts in this case, as gathered from the record, are:

In February, 1894, School District No. 5, Mineral county, Colorado, was carved out of the territory theretofore embraced in School District No. 3 of the same county. All of the statutory requirements for the organization of a school district having been complied with, the superintendent of schools of Min-

eral county, S. E. Van Noorden, received and filed in his office the papers in the matter of the organization of school district No. 5, and endorsed thereon:

"Copy of secretary's report of school meeting held Feb'y 21, 1894, at Bachelor, Colo.

"Received and filed in my office February 27th, 1894. Upon examination of all the papers attached hereto finding that all the proceedings in the forma-tion of a new district the laws of the state of Colorado have been complied with, I hereby number the said new district: School District No. 5.

"Dated Feb'y 27, 1894.

"S. E. VAN NOORDEN,
"Supt. of Schools."

Included in the papers above referred to, was a description by metes and bounds of the territory of school district No. 5, adopted by the electors, which papers have ever since remained in the office of the county superintendent of schools of Mineral county.

April 8, 1894, Henry Wilcox, a resident and tax-payer of school district No. 3, appealed from the action of the county superintendent to the state board of education, it not appearing from the record, how-ever, which action of the county superintendent was appealed from by Wilcox.

September 20, 1894, the boards of directors of school districts No. 3 and No. 5 and the county super-intendent of schools, met in joint session and attempted to change the boundaries of school district No. 5, so far as the same affected certain territory which had theretofore been included within the boun-daries of school district No. 3, and it was then agreed between the two boards and the county superintend-ent, that the compromise line thus attempted to be fixed and determined at this time, should be the line between these two districts and that the appeal of

Wilcox to the state board of education should be dismissed.

The boundaries attempted to be agreed upon by the two boards and the county superintendent at this meeting, materially differ from the boundaries set forth in the petition for an election, approved by the county superintendent, and adopted by the action of the electors of district No. 5.

No question seems to have been raised or objection made by anyone, to the action of the two boards, until some time in 1899, when the then president of the board of directors of school district No. 5, requested the county superintendent to furnish him with a description of district No. 5. In response to this request, the description furnished, was the one set forth in the petition for the organization of district No. 5, and which had been adopted by the electors of the district.

It appears that no such map or record of the boundaries of district No. 5, as is required by Mills' Ann. Stats., sec. 3988, was found in the office of the county superintendent of schools at this time. Thereupon the president of the board of directors of school district No. 5, prepared and tendered to the county superintendent, a map showing the boundaries of district No. 5, as adopted by the electors, and demanded that the same be filed and recorded in the office of the county superintendent, which demand was refused.

January 30, 1900, an action was instituted by the relator herein, against the county superintendent, in the district court of Mineral county for the purpose of compelling the county superintendent to make or cause to be made, a map exhibiting the boundary lines of the several school districts in Mineral county, and more particularly the boundaries of school district No. 5 in said county, and to record a description of

the boundaries of school district No. 5 in a book to be kept for that purpose.

May 23, 1900, judgment on the pleadings was rendered in this action as follows:

"That a writ of mandamus be awarded herein, compelling Laura Pollock, county superintendent of schools, to make and keep a record of the boundary lines of the school districts herein, if known, and if not known, to ascertain and determine the same and then make a record thereof as required by statute, and to prepare and keep a map in her office showing the boundary lines of said districts as required by law, said records and map to be made within a reasonable length of time."

Pursuant to this mandate of the district court, the county superintendent "recorded the description as found by her in the book kept in her office for such purpose, and caused a map to be prepared corresponding thereto," which description and map accorded with the boundaries of district No. 5, as attempted to be agreed upon by the action of the boards of directors of school districts No. 3 and No. 5 and the county superintendent, September 20, 1894.

The relator district appealed from this action of the county superintendent of schools to the state board of education.

July 25, 1900, the state board of education addressed the secretary of school district No. 5, as follows:

"Denver, Colorado, July 25, 1900.
"Secretary of School District No. 5, Bachelor, Colorado.
"Dear Sir:

"At a meeting of the state board of education, held July 23, 1900, in the matter of appeal of school district No. 5 from the action of the county superintendent of Mineral county in regard to fixing the

boundary lines of said district in accordance with certain descriptions presented, it appearing to the board that the county superintendent had declared the boundaries in accordance with the only description on record, and as it would seem to be a matter to be decided by the courts upon direct evidence as to the reliability of the testimony offered concerning the boundaries, the board unanimously decided that it had no jurisdiction in the matter, and the case was ordered remanded to the county superintendent.

"Yours truly,

"HELEN L. GRENFELL,

"President, State Board of Education.

"DAVID M. CAMPBELL,

"Atty. Gen.

"ELMER F. BECKWITH,

"Sec'y State."

Relator district applied to the state board of education for a rehearing in the matter, which was granted, and thereupon the following decision was rendered, January 4, 1901:

"In the matter of the appeal of school district No. 5 in the county of Mineral, taken from the order of the county superintendent of that county, Mrs. Laura D. Pollock made on the 25th day of May, A. D. 1900, the state board of education being in regular session for the purpose of considering the case herein, met on this 4th day of January, A. D. 1901, finds that there is filed a motion before said board, asking that it review its findings made on the 25th day of July, A. D. 1900, and to pass upon further questions that were then presented in the appeal.

"There appeared before the board, representing district No. 3, James D. Pilcher, attorney from Creede, and Mr. F. E. Wheeler, chairman of the said school board of said district; also district No. 5 was represented by A. L. Moses, attorney from Creede,

and there being present Mr. J. K. Terrill, chairman of the board of school district No. 5.

"The Board having carefully considered the motion filed before it, as well as the original papers in the case, hearing arguments from both sides, finds that it did not consider every question involved in the appeal on its former decision, and finds it to be its duty to grant a further hearing in the matter, and such intention was announced by the board to counsel representing the school districts interested.

"It appeared to the board that the petition was filed with the county superintendent of Mineral county in 1894, asking for a division of school district No. 3; that county superintendent favorably acted upon the petition and granted a division of school district No. 3, and after receiving proper notices of the election of officers to, and the organization of the new school district, the superintendent then and there numbered it district No. 5.

"As it appears to the board, there was no question but what school district No. 5 was legally constituted. After electing its officers, it began to transact business as a school district.

"It further appears to the board that school district No. 3 was not satisfied with the decision of the superintendent in creating district No. 5, and caused an appeal to be taken from the decision of said superintendent creating district No. 5 to the state board of education. Before the said board of education passed upon the appeal the directors of school district No. 3 and school district No. 5 met in joint session, together with the superintendent, and agreed upon a change of the boundary lines of the above districts, which would be satisfactory to the two boards. The then county superintendent, Van Noorden, caused maps to be made of each school district as per the agreement then made.

"It appears to the board that the superintendent, Mrs. Laura D. Pollock, in fixing the boundary lines of school district No. 5, recognized the agreement made between the two boards representing districts No. 3 and No. 5, and recognized the boundaries authorized by county superintendent Van Noorden.

"It further appears to the board that the description of district No. 5 as it was properly created by the superintendent in 1894, is found among the papers on file in this office, was also among the records on file in the office of the superintendent of Mineral county. That in making her decision she considered the description as specified in the petition for the creation of school district No. 5 as well as the agreement between the two boards for the change of boundary lines of school district No. 3 and No. 5, and that she acted upon the information given her through two depositions taken, as well as the maps of district No. 3 and No. 5, filed in her office, hereinbefore referred to.

"It appears that she took into consideration the acquiescence of both school districts in the boundary lines as fixed by the joint session of both boards, and the recognition that each district has ever given to the boundary lines, as then established.

"The board finds that both school districts may have certain equities and rights in the boundary lines as was fixed by arbitration of the school boards which it cannot pass upon. These rights can only be adjusted by the court upon a careful examination of the entire matter.

"But it is the judgment of the board that the boards of directors of the two respective districts had no authority in joint session to change the boundary lines of school districts as they existed at the time they were established by the county superintendent

or of district No. 5 as it was established by the county superintendent of that county.

"It therefore finds, that school district No. 5 exists now as it did exist as per the petition forming its boundaries at the time of its creation. It does not attempt to pass upon any of the equities or rights acquired by either school district, in their acquiescence in the boundary lines for school districts Nos. 3 and 5, as fixed by the compromise of said school boards.

(Signed)               "HELEN L. GRENFELL,
                       "ELMER F. BECKWITH,
                       "DAVID M. CAMPBELL,
                       "State Board of Education."

January 19, 1901, the relator district made a formal demand upon the county superintendent of schools to change the recorded description and map in her office to conform with the last above decision of the state board, which was refused, and this action was instituted by filing in the district court of Mineral county a petition and affidavit for mandamus, February 13, 1901, being the second action of like tenor and import instituted by the relator in this behalf.

February 15, 1901, school district No. 3 and Henry Wilcox as petitioners, filed with the state board of education a petition for a rehearing or a review of the decision of the state board rendered January 4, 1901, in which petition all matters relating to the formation of district No. 5 were set up, the relator district herein being named as respondent therein. The state board assumed jurisdiction of such petition and made the following order, with reference thereto:

"The board decides that it will fix a time for hearing the Wilcox appeal, as well as all matters relating thereto, by trial *de novo*, as provided in sec-

tion 4055, M. A. S., and also the appeal of school district No. 5 in connection therewith.

"Upon agreement of all parties concerned, April 15, 1901, was fixed as the date of such hearing.

"By order of the state board of education.

"HELEN L. GRENFELL,
"President.

"Denver, Colo., Mar. 14, 1901."

June 10, 1901, the state board of education rendered a decision in the matter, by the terms of which decision the board dismissed the Wilcox appeal and affirmed the decision of the county superintendent of schools of the 23rd of May, 1900, which last referred to decision of the county superintendent of schools was the one, wherein, inobedience to the mandate of the district court of Mineral county, she recorded the description and prepared a map showing the boundaries of school district No. 5, according to the compromise agreement of the two boards and the county superintendent, of September, 1894. This last decision of the state board is not in the record; its purport, as given above, is pleaded in the second supplemental answer of respondent.

The petition and affidavit herein, upon which this action is based, state a good cause of action.

The answer and second supplemental answer, which was filed August 5, 1901, after the rendition by the state board of education of its decision of June 10, 1901, was in the nature of a confession and avoidance. It admits, substantially, all that is alleged in the petition and affidavit, sets up the action of the two boards of directors of school districts No. 3 and No. 5, the proceedings before the county superintendent and the state board of education, resulting in the decision of the state board of June 10, 1901, and alleges acquiescence upon the part of school district No. 5 in the action of the two boards and the county

superintendent of September, 1894, and that school district No. 3, relying upon such compromise, had collected taxes, built and maintained schools and issued a bonded indebtedness upon and covering the territory included within the boundaries as determined by the joint action of the boards and the county superintendent.

The reply challenges the jurisdiction of the state board, questions the correctness of the last judgment or decision of the state board and denies acquiescence upon its part, in the action of the two boards of directors and the county superintendent.

The cause came to trial before Judge Northcutt, sitting at Creede in Judge Holbrook's stead, resulting in a judgment of dismissal with costs against the relator, upon motion of respondent, after the relator had rested its case, from which judgment relator prosecutes this appeal.

Under the statutes of this state, the county superintendent of schools and the state board of education in the discharge of the duties of their respective offices, perform ministerial and *quasi*-judicial duties.

"A ministerial act is one which the person performs upon a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of doing an act."—20 Am. & Eng. Ency. 793.

"*Quasi*-judicial functions," says Mr. Bishop, "are those which lie midway between judicial and ministerial ones. The lines separating them from such as are thus on their two sides are necessarily indistinct; but in general terms, * * * when the law, in words or by implication, commits to any officer the duty of looking into facts, and acting upon them, not in a way which it specifically directs, but after a discretion in its nature judicial, the function

is termed *quasi*-judical.''—Bishop on Non Contract Law, §§ 785, 786.

In the light of the foregoing definitions, an examination of the statutes defining the duties of the county superintendent of schools and the state board, will readily determine the duties of those officers which are ministerial and those which are *quasi*-judicial in their character.

In the formation of school districts, the county superintendent, by the statutes, is required to discharge duties of both characters. As bearing upon this question the following provisions of the statutes are pertinent:

Mills' Ann. Stats., sec. 3991: ''For the purpose of organizing a new district out of a portion of one or more old districts, the parents of at least ten children of school age residing within the limits of the proposed new district shall petition the county superintendent in writing, which petition shall describe the boundaries of the proposed district and the names of all children of school age residing in such proposed district at the date of such petition; * * * If, in the judgment of the county superintendent, the school interests of the districts affected by the proposed change will be best promoted by said change, he shall direct some one of the petitioners, who is a legal voter, to notify each elector residing within the district so to be formed, by personal service as far as convenient, and to post a notice in three public places in said new district, that such petition has been made and that a meeting will be held, naming the time and place of such meeting, to determine the question of the proposed organization.''

Sec. 3992. ''The qualified electors of such proposed new district, when assembled in accordance with the notice above required, shall organize by electing a chairman and secretary. * * * The sec-

retary of said meeting shall immediately transmit to the county superintendent a copy of the proceedings of the meeting, upon the receipt of which, if the proceedings are found to have been in accordance with the law, he shall establish and number such district and enter a record of the same, and of the proceedings of the meetings, as provided in section twenty-four (24) of this act."

Section 24, above referred to, is Mills' Ann. Stats., sec. 3988.

"It shall be the duty of the county superintendent to ascertain the boundaries of each school district in his county, and to make and keep a record of the same in a suitable bound book, which record shall show definitely the boundaries of each district. In case the boundaries are found to be conflicting or incorrectly described, he shall harmonize the same and make a report of such action to the board of school directors whose districts are affected thereby. District officers shall have access to such records for the purpose of examination, making copies, or for other legitimate purposes. The county superintendent shall prepare or have prepared a map of the county, showing the correct boundaries of the districts."

The only *quasi*-judicial duty imposed upon a county superintendent by the above statutes, is to determine whether the school interests of the districts affected by the proposed change will be best promoted by such change, as the discharge of this duty involves looking into facts and acting upon them as his judgment and discretion may dictate. This provision seems to vest in the county superintendent of schools a veto power. He may refuse, in the exercise of his discretion, to permit an election to be held, which would be an end of the matter.

The duty of establishing and numbering a dis-

trict, entering a record of the same and of the proceedings of the meeting, ascertaining the boundaries of each district, making and keeping a record of the same in a suitable bound book, which record shall show definitely the boundaries of each district, and preparing or having prepared a map of the county showing the correct boundaries of the districts, is purely ministerial, and must be performed in obedience to the mandate of the law, without regard to or the exercise of the officer's judgment upon the propriety of doing the act.

Mills' Ann. Stats., secs. 3991, 3992, *supra,* provide the only method for the formation of new school districts, and it will be seen, that after the county superintendent has determined that the school interests of the districts affected will be best promoted, the sole power to determine the question as to whether or not the district shall be organized, and the boundaries of the district, has been placed by the legislature in the electors of the proposed district. Neither the board of directors of the school district, the county superintendent of schools or the state board of education can organize a school district or change its proposed or established boundaries, except where the boundaries are found to be conflicting, which is not the case here.

The petitioner in this case sought to enforce the performance by the county superintendent of schools of a purely ministerial or clerical act, to wit, to record in a book kept by her for that purpose, the description of the boundaries of the relator district as defined by the electors, and to prepare a map of the same, pursuant to the requirements of Mills' Ann. Stats., secs. 3988 and 3992, *supra.*

This being a purely ministerial act, the relator district being without other remedy, would be entitled to a writ of mandamus upon the proper showing.

This brings us to a consideration of the jurisdiction and authority of the state board of education in the premises, and the effect of its decisions, under the facts in this case.

Section 1, article 9, constitution of Colorado, declares:

"The general supervision of public schools of the state shall be vested in a board of education, whose powers and duties shall be prescribed by law; the superintendent of public instruction, the secretary of state and the attorney-general shall constitute the board, of which the superintendent of public instruction shall be the president."

Mills' Ann. Stats., sec. 3966: "The state board of education shall meet at the state capitol on the last Saturday in December, in each year, and at such other times and places as may by them be deemed necessary, and shall have power to adopt any rules and regulations not inconsistent with the law, for its own government and for the government of the public schools."

Sections 3967 and 3968, as amended by the session laws of 1899, and section 3969, relating to the issuance of state diplomas are the only provisions of the statutes in which the power of the state board is touched upon, until we come to the provisions relating to appeals, in chapter 109, Mills' Ann. Statutes.

Section 4049, provides for appeals from the district boards to the county superintendent. Sections 4050 to 4054 provide the manner and method of procedure in such appeals.

Section 4054: "At the time thus fixed for hearing he shall hear testimony for either party, and for that purpose may administer oaths if necessary, and he shall make such decision as may be just and equitable, which shall be final, unless appealed from, as hereinafter provided."

Section 4055 provides for appeals from the county superintendent to the state board of education.

"Any person or district board aggrieved by any decision or order of the county superintendent, in the matter of law or fact, may, within thirty days after the rendition of such decision or making of such order, appeal therefrom to the state board of education, in the same manner as provided in this act for taking appeals from the district board to the county superintendent, as nearly as applicable. In case of an appeal, where a trial has been had before the county superintendent and a decision rendered, the state board shall examine a transcript of such proceeding and render a decision therefrom, but no new testimony shall be admitted. In other cases of appeal the board may require of the parties such papers and documents as may be thought necessary, and the board shall have power to administer oaths through its president. The decision of the board or a majority of said board, shall be rendered by the president, and such decision, when made, shall be final."

It will be noticed that these statutory provisions confer upon the district board of directors, the county superintendent of schools and the state board of education the power to decide questions of law and fact, and unless an appeal be taken from the decisions of the county superintendent, the decisions of that officer become final, and if an appeal shall be taken, then the action of the state board becomes final.

To hold that such judgments or decisions are final in the sense that they are not reviewable by the courts, and that no judicial inquiry into their correctness can be had, would be to hold that three officers of the executive department, the superintendent of public instruction, secretary of state and the attor-

ney-general, by the statute granting an appeal to them, have been vested with powers properly belonging to the judicial department, which would be clearly repugnant to section 1, article 6, of the constitution of Colorado, which vests the judicial power in the courts therein enumerated. However, appellee does not contend that the decisions or judgments of the state board are not reviewable by the courts, but insists that such decisions and judgments cannot be reviewed in an application for mandamus, for the reason that to so hold would be to convert a writ of mandamus into an appeal or writ of error, for the review of the alleged erroneous decisions of an officer or board vested with discretionary or judicial powers.

There are two answers to this argument.

First, this action is not against the state board and the authorities cited in support of the well-settled principle that a writ of mandamus will not issue to control discretion, are not in point.

Second, the last decision of the state board is pleaded by the respondent as a defense to this action. The jurisdiction and power of the state board to render this decision and the correctness thereof is raised by the reply, and it being conceded that such decision may be reviewed by the courts, we know of no principle or rule and we have been cited to none, which precludes the court in this action when this issue is presented from deciding the same. The only issue made by the pleadings up to the time when the last decision of the state board was pleaded by the respondent in its second supplemental answer, more than five months after this action was commenced, was whether or not the county superintendent must perform a ministerial or clerical duty in accordance with the plain requirements of the statutes. Thus, by the second supplemental answer and

reply thereto, the validity of this decision of the state board was squarely presented to the court below, and by this appeal is here for determination.

The state board in its decisions heretofore set forth, recognizes the fact, that there were questions involved in this matter which should be left to the final determination of the courts. The court below took the position that, in a proper action, it would have jurisdiction to determine the boundaries between the two districts involved, but that the statutes had designated another forum which had power not only to declare what the boundaries were, but power to ascertain and establish them. In this the court erred, if meaning thereby that the state board had power to ascertain and establish the boundaries of school districts, as we have seen, that the statutes vest this power solely and absolutely in the electors of the proposed district, after the county superintendent has approved the petition for the organization of a new district and ordered an election thereunder. The report of the proceedings of the organization of the new district having been made to the county superintendent, that officer finding the same to have been in accordance with law, the duties imposed by the statute upon the officer are purely ministerial, to be performed in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of doing the act.

The *character* of this duty cannot be changed by an appeal to and the decision of the state board, and should the state board, a branch of the executive department, assume to exercise judicial functions, it would exceed its authority, and any decision it might render would be a nullity. A contrary doctrine would lead to the result that, whereas by the statutes, the electors, of the proposed district are

the sole depository in whom is placed the authority to fix and determine the boundaries thereof, an appeal from the action of the county superintendent to the state board would vest in the state board power not conferred on it by the law, that is, power to establish or change the boundaries of a school district.

It is well settled that executive boards, such as state boards of education, must find warrant in the statutes for the exercise of any power which they assume, or must derive such power by necessary implication from some power expressly conferred.

Our conclusion is, that the state board has no power or authority, by its decision, to change the boundaries of a school district, as established by the electors at a meeting called for that purpose, pursuant to sec. 3991 and sec. 3992, Mills' Ann. Stats., *supra,* and that the decision of the state board, of May 23, 1901, cannot be sustained, unless it be by virtue of sec. 4007, Mills' Ann. Stats.

"All school districts now formed or which may hereafter be formed, which shall continue to exercise, undisputed, the prerogatives, and enjoy the privileges, of a legally-formed district, for the period of one year next succeeding the election of its officers, shall be deemed to be a legally-formed district, and its legality shall not thereafter be questioned."

The second supplemental answer of respondent avers that after the action of the two school boards and the county superintendent, of September 28, 1894, the respondent exercised and continued to exercise, undisputed, the prerogatives, and enjoyed the privileges of a legally-formed district, within the boundaries fixed by the agreement of that date, for a period of more than five years, by erecting and maintaining schools, issuing a bonded indebtedness,

collecting taxes and performing all acts necessary to the existence of a school district.

The reply denied all of these averments, thus squarely presenting this issue, which should have been tried and determined by the court below.

If it should appear that school district No. 5 had permitted school district No. 3 to exercise, undisputed, the prerogatives, and enjoy the privileges of a legally-formed district for a period of one year next succeeding the election of its officers, over the territory in dispute, then, under the provisions of sec. 4007, Mills' Ann. Stats., *supra,* it has lost that portion of its territory, as fixed and determined by its electors at the meeting of February, 1894. Sustaining this conclusion are the following authorities:— *Collins v. School District,* 52 Me. 522; *School District v. School District,* 81 Mich. 339; *Atty. General v. School District,* 54 Minn. 213; *State v. School District,* 42 Neb. 499.

Our attention has not been called to an authority, under a similar statute, which holds a contrary doctrine.

It therefore follows, that the judgment must be reversed, the case remanded, with instructions to the court below to try and determine the issue above indicated, pursuant to the views herein expressed.

*Reversed.*